## In Re Petition of Penobscot Lumbering Association.

### Penobscot.    Opinion December 26, 1899.

*Lumbering Association. Safety Fund. Debts. Priv. and Spec. Laws, 1854, c. 298; 1869, c. 34; R. S., 1857, c. 47, § 73.*

The obvious intention of a statute, and not its literal import, is to govern.

*Held;* that the legislature intended by the use of the word "debt," in the charter of the Penobscot Lumbering Association, to include not only sums of money due under simple contract, or by specialty, but also unliquidated claims for damages arising from negligence.

Section seven of the amended charter of the Penobscot Lumbering Association, (Private & Special Laws of 1869, chap. 34) provides for the gradual accumulation of a "safety fund" by the association, and further provides that the safety fund, at the end of a specified period, shall be used, among other things, "to pay any other debt of the association," and that any part of the fund not needed for the purposes designated by the Act, shall be paid back to those who paid it, under the direction of a justice of the Supreme Judicial Court. Upon a petition of the association to a justice of the court for such a distribution of the fund, objection to a present distribution was made by parties who have in suit claims against the association for damages alleged to have been sustained by them through the negligence of the association in booming and rafting their logs, within the period during which the safety fund was accumulated.

*Held;* that the "safety fund" was intended to stand as security for the payment of all the debts and liabilities of the association, which remain unpaid, and including unliquidated claims for damages arising from the negligence of the association.

*It is held, therefore,* by the court that this safety fund should be held for the security and payment of the contingent liabilities named in the petition. The justice before whom the proceedings are pending may fix some reasonable time within which these liabilities are to be reduced to judgment, and may extend such time, if it becomes necessary. After which, upon payment of such judgments, by the association, or out of the safety fund, the balance of the fund shall be paid back to those who paid it, or to their heirs or assigns, under the direction of said justice.

See *Sibley* v. *Penob. Lumbering Assoc.* post, p. 399.

On Report.

Petition by the Penobscot Lumbering Association for distribution of a safety fund accumulated under its charter. The case is stated in the opinion.

C. P. *Stetson* and M. *Laughlin*, for petitioner.

C. F. *Woodard;* C. J. *Hutchings;* J. D. *Rice;* P. H. *Gillin* and T. B. *Towle*, for intervening parties in opposition.

SITTING: PETERS, C. J., EMERY, HASKELL, WISWELL, SAVAGE, FOGLER, JJ.

SAVAGE, J.   The Penobscot Lumbering Association is the lessee of certain booms, piers and other property belonging to the Penobscot Boom Corporation, in Penobscot river, and carries on the business of booming and rafting logs in that river under the provisions of a charter granted to it by the legislature in 1854. Private and Special Laws of 1854, chap. 298.   Any owner of lumber in the Penobscot river, or designed to come into the Penobscot boom, may become a member of the corporation in the manner specified in the charter and by-laws.   Section 3.   A certain toll or boomage on logs passing through the booms is paid by the association to the Penobscot Boom Corporation as a rental for the leased property, and the boom corporation has a lien on any and all such lumber to secure the payment of such tolls.   Section 9.   Provision is made for the enforcement of the claim of any member who has suffered loss or damage through the neglect or carelessness of the association or its officers.   Section 11.   In order to meet all payments and expenses of every character, due from the association, it is made the duty of the association to make and enforce assessments therefor, either after the payments or expenses or in anticipation of the same.   The assessments are to be pro rata upon every thousand feet of lumber passing through the booms, and a lien is given on the logs to secure the payment of the assessments. In addition, the association may recover the assessments by action of assumpsit.   Section 18.   If the assessment collected exceeds the amount paid for the use and repair of the boom and all other expenses, the surplus is to be refunded pro rata to those from whom it was received.   Section 19.   So much of the general financial system of the association should be taken into consideration, when we attempt to construe the provisions of the "safety fund," concerning which this controversy has arisen.

In the original charter, § 19, we find the following language relating to a safety fund: "In order to ensure the safety of debts due from the association, it shall be its duty before taking control of the lumber in the boom, to establish and constantly to maintain a substantial fund amounting to at least fifty thousand dollars, lodged in the hands of a trustee." Section 20 provided that "so often as any judgment or other liquidated claims against the association shall be made, it shall be the duty of the trustee to pay the same out of the safety fund." It was also provided that the safety fund might consist of good and well secured notes, and that the notes might be given by members of the association as individuals, or by other persons.

In 1869, the foregoing provisions relating to a safety fund were repealed. Private and Special Laws of 1869, chap. 34, § 4. And in this latter act the following new provision for a safety fund was made: "The association shall every year assess and collect one-half cent for every thousand feet on all logs that come into the boom, and shall deposit the same in the Bangor Savings Bank, . . . . as a safety fund, to remain there on interest till the end of fifteen years and then to be used, first, for the payment of any and all sums due to the Penobscot Boom Corporation from the association for not restoring the boom in good condition, or other cause; and, second, to pay any other debt of the association; and any part of said fund not needed for said purpose shall be paid back to those who paid it, or to their heirs or assigns . . . .

"The application or distribution of this fund shall be made under direction of one of the justices of the supreme judicial court to be designated by the chief justice." Section 7.

The charter, with this provision in it, was granted in 1869, for the term of fifteen years, and in 1883 was renewed for another fifteen years. At the expiration of this latter period, the pending petition was made to a justice of the supreme judicial court for a distribution of the safety fund collected during the period, and then amounting to $13,854.98. The petition sets forth that "there are not any sums due from said association to the Penobscot Boom Corporation under the provisions of said section seven"

(of the amended charter, Private and Special Laws of 1869, chap. 34,) "and said association does not owe any other debts whatsoever, unless the following contingent liabilities shall he construed to be 'debts' within the meaning of the language of said section seven, namely :—There are now pending in the supreme judicial court for the county of Penobscot, six actions against said association for alleged negligence of said association during the rafting season of 1893 (within said period of fifteen years,) in sorting, rafting, delivering and caring for the logs of various owners; that is to say, one in favor of G. C. & G. H. Sibley, against said association, which was tried at the April term, 1899, of said court, and a verdict obtained for the plaintiffs in the sum of about $300, and in reference to the same there is pending a motion and exceptions to be argued at the June law term at said Bangor," and five other similar actions not yet tried, in all of which damages to the amount of $21,000 are claimed.

After notice to all parties interested, the several plaintiffs in the foregoing actions appeared to object to the distribution as prayed for, and by consent, the justice before whom the petition was pending reported the whole matter for the determination of the law court. The stipulation is that, if this court determines that the safety fund should be distributed as prayed for in the petition, then it shall forthwith be distributed under the direction of the justice below; but if this court determines otherwise, then "it shall give such directions regarding the premises, as it may deem legal and proper."

The facts stated in the petition are admitted to be true. It appears by the report that the booms of the Penobscot Boom Corporation are in good condition as contemplated by the provisions of section seven of the Act of 1869, the section under which these proceedings were instituted. It also appears that the association owns personal property of the value of about $2600, and possesses cash to the amount of about $1800.

The parties objecting to a present distribution of the safety fund among the members of the association who contributed to it contend that, under the charter, it should not be distributed until all

sums due the Penobscot Boom Corporation are paid, *nor until all other debts of the association are paid;* and they say that their unliquidated claims for damages growing out of the alleged negligence of the association in the performance of its duties to them, as log owners, are "debts" within the meaning of the petitioner's charter, and so are entitled to be paid out of this fund, at least, after being reduced to judgment, and meanwhile are entitled to have it held as a "safety fund." And, since nothing is due to the Penobscot Boom Corporation, it only remains to inquire whether the contention of these claimants should be sustained.

The legal construction of the word "debt," as found in statutes, has been the subject of much discussion in the decisions, but a review of them would be of little service here. The construction of this statute must fall within the general rules for the construction of all statutes, and the chief of these rules is to give effect to the legislative intent, as it may be ascertained from all the language used. And within that rule, it will be our duty to give the word "debt" such a construction in this case as will carry out what we think is the evident design of petitioner's charter. The obvious intention of a statute, and not its literal import, is to govern. *Seiders* v. *Creamer*, 22 Maine, 558; *Holmes* v. *Paris*, 75 Maine, 559; *Allen* v. *Young*, 76 Maine, 80. The meaning of the statute is to be ascertained though it seems to conflict with the words. *Landers* v. *Smith*, 78 Maine, 212; *Gray* v. *County Commissioners*, 83 Maine, 429. This is only saying that a statute must be construed according to the obvious legislative intent shown by all of its provisions taken together, and that the special meanings of some words may be enlarged or modified by the general meaning of all the words as a whole. The meaning of the word as used in the charter may be extended beyond the technical and limited significance of the word itself. *Smith* v. *Chase*, 71 Maine, 164.

What did the legislature intend by the use of the word "debt" in this section nineteen of the original charter? Was it only to include sums of money due under simple contract or by specialty, or was it to include any claim for money, even an unliquidated

claim for damages arising from negligence? We think the answer is to be found in the charter. Looking into that instrument, the substance of which so far as it is important we have already given, we find that the petitioner is a business corporation, carrying on the business of booming and rafting logs. It owns property and employs men. It is liable to incur the expenses and to sustain the losses and damage which are incident to that kind of business. The charter anticipates that the association may become liable to log owners for damages occasioned by its negligence, and in addition to the common law right of action, gives the log owner a remedy by summary process for the enforcement of his claim for damages. Section 11. It is made the duty of the association to make and enforce assessments of money "in order to meet *all payments and expenses of every character* due from the association." Section 18. This language is broad enough to cover every conceivable payment which the association might legally make, and includes claims for damages like those in question. The association may make such assessments in anticipation of the necessary payments, or after the payments have been made. Which course was pursued in 1893, the year these claims for damages arose, does not appear. But it may be inferred that if any more money was assessed and collected in that year than was equal to the amounts paid for current expenses, it has been refunded to those who paid it, for such a course is authorized by section 19, and seems to be contemplated as the proper course. The petitioner's statement of the amount of cash on hand does not convey the impression that any has been reserved or set aside to satisfy judgments in these cases.

It may seem that these provisions of the charter would be sufficient, if effective, to provide money for all payments required to be made in any contingency. But it appears that in the very same section which authorizes the return of the surplus of the assessments to the contributors, provision is made for a safety fund, "in order to ensure the safety of debts due from the association." Assessments might be made to cover all kinds of necessary expenditures. Was the safety fund intended to apply to anything less?

Sections 18 and 19 are very closely associated in purpose, and they should be construed together. We think that the word "debts" in section 19 was intended to be synonymous with "payments and expenses of every character" in section 18. It was the duty of the corporation to assess for payments and expenses. But it might fail to do so, or it might fail to collect, or contingencies might arise by which it might lose the security of its lien upon the logs or be unable to enforce payment by action at law, or claims might first be made known after the surplus of the assessment had been redistributed under section 19. And foreseeing such contingencies, the legislature said that the association must provide a "safety fund," before it assumed control of the logs, and out of this safety fund should be paid "judgments and other liquidated claims." Section 20.

Now it is evident that section seven of the amendatory act of 1869 was intended to be a substitute for the safety fund provisions in the act of 1854, which were repealed; and we think that the safety fund provided for in the act of 1869 was intended for the security of the same classes of payments, expenses and liabilities as were secured by the original safety fund. The essential difference lies in the different manner in which the fund is made up. The later statute uses the word "debt" just as the former does, and we think with the same significance. One or two authorities are cited by way of illustration. In *Hewett* v. *Adams*, 50 Maine, 271, where a claim was made upon the stockholders of a bank, arising out of alleged official mismanagement of the directors, it was held that the word "debts" used in R. S., 1857, chapter 47, § 73, was synonymous with the word "claims" used in the same section, and that the provisions making stockholders liable for "debts" of the bank would make them liable for a "claim" of that nature. See also *Mill Dam Foundery* v. *Hovey*, 21 Pick. 417.

The amount of available assets left in hand at the end of each year's operations is naturally expected to be small. The boom company owns the booms and piers, and the surplus of cash of the association is redistributed. But, surely, it must be understood that the charter contemplates that all legal liabilities of the petitioner must in the end be satisfied in some way, unliquidated

claims for damages, as well as simple debts. If a claim for damages arises, or if one is contested and goes to judgment, only after the assessment for the year in question has been made, or after the surplus for that year has been redistributed, how is it expected that it shall be paid? Shall it be provided for by a new assessment on the log owners of the year when the damage occurred? Such an assessment may be uncollectible. The log owners may have become insolvent or their estates beyond the reach of legal process. Or, shall the assessment be made on the log owners for the year after the claim is reduced to judgment, in this case, many years after the damage complained of occurred? Such a course may be unfair and inequitable. These considerations also lead us to the conclusion that the safety fund was intended to stand for the security and payment of all such claims and liabilities which remain unpaid. The fund is the annual contribution of log owners for just this purpose. To the objection that by this means the contributions of the log owners for one year may be used to pay liabilities of another year when the contributors were not owners, it may be replied that such may be the inevitable consequence whenever persons associate themselves together in a corporate body. The corporate fund at the time of payment pays the liability, regardless of who contributed it, or who were stockholders at the time the liability arose.

We are, therefore, of opinion that this safety fund should be held for the security and payment of the contingent liabilities named in the petition.

The justice before whom the proceedings are pending may fix some reasonable time within which these liabilities are to be reduced to judgment, and may extend such time, if it becomes necessary; after which, upon payment of such judgments, by the association, or out of the safety fund, the balance of the fund shall be paid back to those who paid it, or to their heirs or assigns, under the direction of said justice.

*Case remanded for further proceedings in accordance with this opinion.*